IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Brenda Evans, | ) | |
| | ) | C.A. No. 8:05-2575-HMH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **OPINION AND ORDER** |
| Eaton Corporation Long Term Disability | ) | |
| Plan, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court for review of the Eaton Corporation Long Term

Disability Plan ("Plan") administrator's decision to deny long-term disability ("LTD")

benefits to Brenda Evans ("Evans") under a plan governed by ERISA.[1]  Evans seeks benefits

pursuant to 29 U.S.C. § 1132(a)(1)(B) and attorney's fees and costs pursuant to 29

U.S.C.§ 1132(g).  (Joint Stipulation ("J.S.") ¶ 1.)  The parties have filed a joint stipulation

and memoranda in support of judgment pursuant to the court's Specialized Case Management

Order for ERISA benefits cases.  The parties agree that the court may dispose of this matter

consistent with the joint stipulation and memoranda.  (J.S. ¶ 8.)

However, the parties disagree as to whether the Plan's administrator, Eaton

Corporation ("Eaton"), "abused its discretion, under the appropriate standard of review," in

denying Evans LTD benefits.  (J.S. ¶ 7.)  For the reasons below, the court finds that Eaton

---

[1]Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-
1461.

1

abused its discretion in denying Evans LTD benefits because there is no substantial evidence to support the finding that Evans was able to perform any occupation on June 1, 2004.

## I. FACTUAL AND PROCEDURAL HISTORY

Until 1998, Evans worked for Eaton as an order processor.  (R. 92.)  In 1998, Evans quit working because of rheumatoid arthritis, severe pain, and swelling.  (Id.)  At that time, she filed a claim for LTD benefits, and the Plan paid her LTD benefits for six years.  (Id. ) The Plan is self-insured and administered by Eaton.  (Def.'s Mem. Supp. J. 1.)  Broadspire Services, Inc. ("Broadspire") is the Plan's claims administrator hired by Eaton to process and review disability claims.

The relevant Plan language is as follows:

> You are considered to have a covered disability (see "Disabilities NOT Covered" for exceptions) under the Plan if:
> . . . .
>
> • during the continuation of such total disability following the first 24 months, you are totally and continuously unable to engage in any occupation or perform any work for compensation or profit or which you are, or may become, reasonably well fitted by reason of education, training or experience – at Eaton Corporation or elsewhere.

(J.S. ¶ 6.)  In addition, the Plan states that

> Objective findings of a disability are necessary to substantiate the period of time your physician indicates you are disabled.  Objective findings are those that can be observed by your physician through objective means, not just from your description of the symptoms. Objective findings include:
> • Physical examination findings (functional impairments/capacity);
> • Diagnostic tests results/imaging studies;
> • Diagnosis;
> • X-ray results;
> • Observation of anatomical, physiological or psychological abnormalities; and
> • Medications and/or treatment plan.

2

(R. 16.)  Further, the Plan requires that Evans be "under the continuous care of a physician who verifies to the satisfaction of the Claims Administrator, that [she is] totally disabled." (Id. 11.)   Broadspire periodically requires a claimant to certify that she remains disabled.  In a letter dated April 26, 2004, Broadspire denied Evans' claim for LTD benefits effective July 1, 2004, stating that there was "insufficient documentation of a functional impairment that would preclude you from the job duties of any occupation."  (Id. 235.)

Evans has seropositive rheumatoid arthritis and has received various medical treatments.  On July 3, 2002, Dr. Robert Boyd ("Dr. Boyd"), Evans' rheumatologist, stated that Evans had substantial rheumatoid arthritis in her hands, wrists, feet, knees, and shoulders, and that "she continues to be completely disabled."  (Id. 146.)  Subsequently, Dr. Boyd prescribed Enbrel for Evans' rheumatoid arthritis, and prior to Broadspire's denial of Evans' LTD benefits in April 2004, she experienced some improvement in her symptoms. However, Evans was experiencing new hip and back problems as the result of a motor vehicle accident in October 2002.  On May 7, 2003, Dr. Boyd indicated that Evans' rheumatoid arthritis was "dramatically better" but "her hips and back are not improved."  (Id. 173-74.) Again, Dr. Boyd found that Evans was totally disabled. (R. 173-74.)

An MRI on July 5, 2003, revealed that Evans suffered from "a combination of disc bulging, herniation and facet joint/ligamentum flavum disease" at the L4 to L5 level "resulting in central canal stenosis with compression of the thecal sac."  (Id. 186.)   Further, the report identified "foraminal stenosis . . . on the right and lateral recess stenosis . . . present bilaterally."  (Id.)  In addition, the MRI revealed "multilevel facet joint degeneration."  (Id.)  On August 7, 2003, Evans' labwork showed that her rheumatoid

3

arthritis factor, RA Latex Turbid, was elevated and her c-reactive protein levels and sedimentation rates were normal.  (Id. 178.)  On August 13, 2003, Dr. Boyd noted that Evans was

> doing extremely well as far as her peripheral joints are concerned with the Enbrel.  This is the best she has felt since I have been seeing her.  It has helped her quite dramatically.  She has very little joint pain now.   Unfortunately her back and hips are continuing to be a problem and her orthopedic surgeon is now referring her to a pain center.

(R. 175.)  An MRI of Evans' lumbar spine on November 10, 2003, revealed "degenerative disc disease with superimposed bony degenerative changes at the L4/5 as described producing spinal stenosis and foraminal narrowing at this level, progressive since 7/26/02."  (Id. 188.)

Evans underwent an EMG, a test to measure muscle response to nervous stimulation, on November 13, 2003, which concluded that "there is evidence of bilateral tibial motor neuropathies and gastrocnemius denervation changes, acute to subacute in nature.  (Id. 190.) This could be consistent with bilateral B1 radiculopathies.  The sural sensory studies are normal."  (Id.)  On September 15, 2003, Evans completed a resource questionnaire, in which she indicated that she was able to cook, shop, do laundry, and wash dishes.  (Id. 153-60.)   In addition, Evans noted that she could drive approximately seven to eight miles a day from her home.  (R. 156-57.)  Further, she listed her hobbies as reading, watching television, and crafts.  (Id.)

Dr. Dennis Murphy ("Dr. Murphy"), Evans' treating physician, performed a comprehensive medical evaluation of Evans on December 30, 2003.  Dr. Murphy's impressions were as follows:

4

1. Seropositive, non erosive rheumatoid arthritis.
     a. History of multiple NSAID and multiple disease modifying drug regimens.
     b. On disability and out of work since 04/13/1998.
2. Chronic pain syndrome.
     a. Chronic painful peripheral polyneuropathy, etiology not identified.
     b. Facet joint hypertrophy and spinal stenosis.
     c. Osteoarthritis.
     d. Chronic knee pain with intermittent effusions.
     e. Chronic post traumatic hand and arm pain.
     f. History of muscle pain with elevated CPK's in the past.
     g. She has been evaluated and managed by multiple physicians including myself, orthopedic surgeon, neurologist, pain therapist and rheumatologist with progressive impairment over time.
3. Arteriosclerotic cardiovascular disease.
     a. Hypertension, adequately controlled.
     b. Vasomotor instability, currently not a major problem.
4. History of elevated hepatic transaminases in 1998. No evidence of liver disease.
5. Recurrent breast cysts.
6. History of pneumonia but no other evidence of pulmonary disease.

(Id. 204-05.)  Dr. Murphy concluded in the attending physician's statement to Kemper, now known as Broadspire, that Evans had "severe limitation of functional capacity/incapable of sedentary work" and that her condition would deteriorate over time.  (Id. 199.)

Dr. Anthony Riso ("Dr. Riso"),  a Broadspire in-house reviewer specializing in anesthesiology and pain management, reviewed Evans' medical records and concluded on January 21, 2004, that

> [t]here is no objective information provided regarding her strength difficulties, neuromuscular, or neurosensory deficits which would preclude work in any occupation.  Certainly claimant would appear to be with limited motility as the fact that she does have spinal stenosis and does use an assisted walking device. Claimant states without medical corroboration that she has problems with her hands and rheumatoid arthritis . . . . It would appear reasonable that claimant has some use of her hands, although perhaps not full use of her hands.  As per above, in any occupation sedentary position which does not involve a great deal of fine manipulation, would appear to be appropriate restrictions based on objective information available to this reviewer.  Should extra information

> become available or other objective testing such as a Functional Capacity
> Evaluation becomes available, these recommendations can be modified.

(Id. 209.)  Dr. Riso, in rendering his opinion, did not have Dr. Murphy's comprehensive

medical evaluation of December 31, 2003.  Another Broadspire in-house physician reviewer

specializing in internal medicine, Dr. Wendy Weinstein ("Dr. Weinsten"), reviewed Evans'

medical records and concluded on January 17, 2004, as follows:

> [T]he provided records fail to support a functional impairment that would
> preclude the claimant from performing the job duties of any occupation.  Her
> rheumatoid arthritis has stabilized and there have been no joint findings
> consistent with active rheumatoid arthritis that would preclude the claimant from
> working.  In regard to the claimant's continued back pain with a motor vehicle
> accident in October, the records have also not documented a functional
> impairment that would preclude the claimant from performing sedentary job
> duties.  It does not appear that the EMG findings correlate to the MRI but more
> importantly the physical exam findings do not indicate the claimant would be
> unable to do sedentary work.  The claimant notes on her resource questionnaire,
> dated 9/15/03, that she cooks, shops, does laundry, and does the dishes.  The
> claimant drives and she also watches TV, reads, and does crafts for hobbies.
> There is no indication that the claimant would not be able to perform sedentary
> type work.

(R. 211-12.)  Dr. Weinstein did not have Dr. Murphy's December 2003, comprehensive

medical evaluation for consideration in formulating her opinion.

Evans voluntarily underwent a functional capacity evaluation ("FCE") in February

2004, which found that she could perform light work for eight hours a day.  (Id. 213-220.)

Moreover, Broadspire prepared an employability assessment report dated March 18, 2004,

and a labor market survey dated April 19, 2004, which identified several available light work

jobs that matched Evans' skills and limitations based on the FCE's findings and Evans'

interview.  (Id. 221-32.)

6

Broadspire issued a denial letter on April 26, 2004, concluding that

> the provided records fail to support a functional impairment that would preclude you from performing the job duties of any occupation. Your rheumatoid arthritis has stabilized and there have been no joint findings consistent with active rheumatoid arthritis that would preclude you from working. In regard to your continued back pain with a motor vehicle accident in October, the records have also not documented a functional impairment that would preclude you from performing sedentary job duties.

(Id. 236.) On May 20, 2004, Evans requested an appeal of her claim. (Id. 243.) She supplemented the record with medical records from Dr. Boyd dated April 22, 2004, indicating that Evans was unhappy with her current arthritis medication, Humira, and that she was suffering from back pain, lower left leg edema, swelling of the small joints of her hands and wrist, and tenderness of the soft tissue. (R. 240.) Dr. Boyd switched Evans' medication back to Enbrel and stated that Evans was permanently and totally disabled. (Id.) Evans also provided April 22, 2004, labwork showing elevated rheumatoid arthritis factor, RA latex turbid; AST; and c-reactive protein levels. (Id. 247-48.)

Dr. Dennis Mazal ("Dr. Mazal"), a Broadspire in-house physician reviewer specializing in internal medicine, reviewed Evans' records and concluded in a report dated June 21, 2004, that

> based upon the objective documentation and the medical records submitted for review, there is no substantiation for a loss of functionality precluding the claimant from performing the essential duties of any occupation effective 06/01/04. Restrictions and limitation at the work place would basically include the restrictions and limitations as described in the . . . functional capacity evaluation completed in February [2003].
>
> Additional documentation that could be beneficial in potentially establishing a loss of functionality would include demonstration of the reactivation of significant synovitis due to rheumatoid arthritis and/or worsening of the claimant's spinal canal stenosis.

7

(<u>Id.</u> 257-58.)  On June 16, 2004, Dr. Sheldon Zane, a Broadspire in-house physician reviewer

specializing in rheumatology, reviewed Evans' records and concluded that

> [f]rom a rheumatological standpoint, it would appear that the claimant was
> capable of performing at a SEDENTARY/LIGHT occupation from 6/1/2004 to
> present. This could be accomplished with certain limitations and restrictions
> such as not have to lift/carry more than 10 lbs.  Not have to stand/walk for
> prolonged periods along with the use of an ergonomic workplace and reasonable
> "break" periods.

(<u>Id.</u> 262.)  Further, on June 16, 2004, Dr. Vaughn Cohan ("Dr. Cohan"), a Broadspire in-

house physician reviewer specializing in rheumatology, reviewed Evans' records and

concluded that

> [i]t is my opinion that the documentation provided fails to demonstrate objective
> evidence of a functional impairment which would preclude the claimant from
> performing any occupation effective June 1, 2004.  There is no evidence of
> cognitive impairment.  The claimant's rheumatoid disorder appears to be in
> relatively good control such that her upper extremity function would not appear
> to be impaired to a degree of severity and/or intensity as to preclude her from
> performing a sedentary occupation.  Her low back pain does not appear to be
> associated with an impairment that would preclude her from ambulating and/or
> sitting at a desk for the purposes of performing sedentary job requirements.

(R. 268.)  Dr. Cohan noted that "additional documentation that would be beneficial in

establishing disability would be a current detailed report of rheumatological physical

examination findings and a current detailed report of orthopedic/neurosurgical physical

examination findings."  (<u>Id.</u>)  On July 2, 2004, Broadspire upheld its denial of Evans' claim

for LTD benefits.  (<u>Id.</u> 270-72.)

On August 25, 2004, Evans filed a final appeal.  (<u>Id.</u> 273.)  She submitted a letter

from Dr. Boyd to Evans' counsel dated August 12, 2004.  In the August 2004, letter Dr.

Boyd stated that Evans was totally disabled.  He further noted that

[o]bjective features to support her rheumatoid arthritis are that she is seropositive for rheumatoid factor and does have erosions on x-rays. She, of course, has had elevated inflammatory markers such as sed rate and CRP in the past. From a physical examination perspective she has had heat, redness, swelling and tenderness of 2-4 PIP and MCP joints as well as both wrists. She has had tenderness and swelling of her elbows. Shoulders have been tender. She has had discomfort with range of the hips. Knees have been swollen with heat, redness, erythema, and tenderness. Ankles have been tender. She has had decreased grip and decrease in fine and gross movements of her hands. She has difficulty in raising her arms over her head because of her shoulder pain. She has difficulty standing or walking because of her hip and knee pain. Similarly, she has difficulty sitting for any period of time because of her substantial stiffness that occurs with sitting.

One point of confusion may be that there have been notes in my medical records that have shown that she has been better at times. Saying that she is better is not to say that she is nearly normal or not to say that she is not disabled. One can have a severe arthritic problem and get some improvement with medications and still be incapable functionally of working in a job. That is the case with Ms. Evans. She has had some response to the medications but not enough to allow us to remove the label of permanent and total disability for her. I do not think her situation will ever change and I think she will be disabled long term.

(Id. 274.)  In addition, Evans submitted an x-ray report of October 26, 2004, concluding that

Evans had discogenic spondylosis of L4-5; degenerative anterolisthesis of L4; spondylosis

deformans of C5, C6, and mid to lower lumbar spine; osteoarthritis of mid to lower lumbar

spine; and postural alterations and vertebral malpositions. (R. 288.) The October 2004, x-ray

report also noted "marked loss of the normal sagittal spinal contour" and "a severe decrease

in the height of the L4-5 disc space." (Id.)

On October 20, 2004, prior to receipt of the October 26, 2004, x-ray report, Dr.

Yvonne Sherrer ("Dr. Sherrer"), a Broadspire in-house physician specializing in

rheumatology, reviewed Evans' records and concluded that

[t]he claimant has seropositive rheumatoid arthritis and may have some erosion on x-ray. However, these records support that she has responded to therapy and

9

give no evidence that she currently has severe disease of the nature that would render her incapable of performing any occupation. Further objective functional capacity testing is documented that she can perform at a light level occupation.

(Id. 279-81.)

After receipt of the October 26, 2004, x-ray report, Dr. Sherrer noted in a report dated November 18, 2004, that

[t]his additional information did not document functional impairment sufficient to render the claimant incapable of any occupation. These records document that she had degenerative changes of the cervical and lumbar spine but not of severity to render the claimant incapable of any occupation. Other documentation that would be helpful in evaluating this claim would be current comprehensive musculoskeletal and orthopedic spine examination.

(Id. 291.) Dr. Tamara Bowman ("Dr. Bowman"), a Broadspire in-house peer reviewer specializing in internal medicine, reviewed Evans' records and concluded in a report dated October 20, 2004, that the "medical information supports the ability of the claimant to perform a sedentary level of work." (Id. 287.)

Eaton requested that the Medical Review Institute of America ("MRIoA") review the file, and on November 30, 2004, an anonymous rheumatology and internal medicine physician concluded that Evans' "ability to function, perform most ADLs, and pass an FCE show that she is not disabled." (R. 409.) On January 6, 2005, Eaton issued its final denial letter. (Id. 66-77.)

This litigation ensued. However, on March 1, 2006, the court entered a consent stay to allow Evans to submit additional information for an additional review by Eaton. Prior to the entry of the stay, Eaton's counsel asked Dr. Kevin Trangle ("Dr. Trangle"), a physician

specializing in internal medicine and a disability medicine specialist with IMEX Associates,

Inc., to review the record.  On February 9, 2006, Dr. Trangle concluded that Evans

> does have and has had a low degree of rheumatoid seropositive arthritis with some intermittent low grade synovitis.  However, she appears to be capable of performing sedentary to light activities based upon all the available information and taking into account all of her other medical problems including spinal stenosis.  There appears to be no impediment to her doing a minimal amount of walking and being on her feet at least 15 minutes to 30 minutes out of every hour.  There appears to be no impediment also for her handling objects on a regular basis weighing 10 pounds and occasionally up to 20 pounds.  There appears to be very little if any limitation in her ability to use a computer keyboard, telephone, handle paperwork or talk to individuals.
>
> The medical records of Dr. Boyd indicate that the degree of synovitis has been of a very low grade or absent on several occasions in the 2004 period which represent that last period of time under consideration of her disability status.  Despite the comments by Dr. Cohan on 6/16/04 and Dr. Sherrer on 10/13/04 that an IME examination may be helpful, I believe the medical records are sufficient to indicate that the degree, extent and scope of her problems have been relatively minimal compared to the requirements of a light to sedentary job position.  The examinations by Dr. Boyd, the Functional Capacity Assessments, the laboratory studies, the MRI tests and the EMG/NCV electrophysiological tests all would indicate objective evidence sufficient, in my opinion, that although it may have been helpful it was not necessary to secure such an examination to determine that she has been capable of sedentary to light activity.

(Id. 419.)

After the stay was entered, Evans' counsel requested that Dr. Michael Bucci ("Dr.

Bucci"), a neurosurgeon, examine Evans and opine as to her ability to work.  Evans' counsel

provided Dr. Bucci with Drs. Boyd and Murphy's medical records and the Broadspire in-

house physician reviews.  (Id. 428.)  In April 2006, Dr. Bucci examined Evans and concluded

that she was totally disabled as follows:

> It is my impression Ms. Evans has wide spread degenerative arthritis, rheumatoid arthritis, joint deformities, and severe spinal stenosis, both radiographically and clinically.  She exhibits an increased flexion posture to her

spine, which is typical of spinal stenosis patients.  Extension causes worsening pain.  She is obviously able to flex forward but has difficulty with extension.  Her gait demonstrates this as well.  At the present time, I do not feel that this lady can perform any type of useful occupation given the fact that she is so encumbered with arthritis, both in the form of degenerative arthritis and rheumatoid arthritis.  Furthermore, she has significant clinical and radiographical spinal stenosis, which would limit her ability to function in a work environment as well.

(Id. 422.)  Dr. Trangle reviewed Dr. Bucci's report and noted that his "opinions remain unchanged."  (R. 471.)  On July 7, 2006, Eaton issued a denial letter noting that

[i]n 2006, Dr. Trangle and Dr. Bucci submitted opposing opinions regarding Ms. Evans' disability. Dr. Trangle's opinion was based on a review of the administrative record and reflected his opinion of Ms. Evans' ability to work as of June 1, 2004. Dr. Bucci's opinion appeared to be based on his evaluation of Ms. Evans' current medical condition.  Further, based on the information provided to the Administrative Committee, it does not appear that Dr. Bucci was provided or reviewed the entire administrative record reflecting Ms. Evans' medical history and thus would not be able to render an opinion regarding Ms. Evans' condition at the relevant time.  Therefore, the new information, considered along with the other evidence in the administrative record, does not change the Administrative Committee's January 6, 2005 determination.  As of June 1, 2004, the medical records reflected that Ms. Evans was not disabled from any occupation, and the denial of Ms. Evans' claim for continuation of disability benefits as of June 1, 2004 is confirmed.

(Id. 477.)  Subsequently, the stay in this case was lifted.

## II.  DISCUSSION OF THE LAW

### A.  Standard of Review

The parties agree that the abuse of discretion standard applies, which provides that the administrator's "discretionary decision will not be disturbed if reasonable, even if the court itself would have reached a different conclusion."  Booth v. Wal-Mart Stores, Inc., 201 F.3d 335, 341 (4th Cir. 2000).  A decision is reasonable if it is supported by substantial evidence.  "Substantial evidence . . . is evidence which a reasoning mind would accept as sufficient to

support a particular conclusion . . . [and] consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." LeFebre v. Westinghouse Elec. Cop., 747 F.2d 197, 208 (4th Cir. 1984), abrogated on other grounds by de Nobel v. Vitro Corp., 885 F.2d 1180 (4th Cir. 1989).

## B.  Denial of LTD Benefits

The Plan argues that the "[t]he material facts of the case, derived solely from the Administrative Record reveals that there is no doubt that under prevailing law, [Eaton] is entitled to judgment, because the Record shows that [Evans] could perform work for compensation or profit as of June 1, 2004."  (Def.'s Mem. Supp. J. 4.)  The court disagrees. For the reasons set forth below, the court finds that Eaton's decision to deny Evans LTD benefits was not based on substantial evidence because, when the totality of the record is considered, Evans' examining physicians' opinions are substantially more persuasive than the opinions of Broadspire's in-house physician reviewers, the MRIoA reviewer, and Dr. Trangle.  Further, the objective evidence supports the examining physicians' opinions.

 "[W]hile an administrator does not necessarily abuse its discretion by resolving an evidentiary conflict to its advantage, the conflicting evidence on which the administrator relies in denying coverage must be 'substantial'--especially when . . . the administrator has an economic incentive to deny benefits." Stup v. Unum Life Ins. Co. of America, 390 F.3d 301, 308 (4th Cir. 2004).[2]  Further, although plan administrators are not required to give a treating

---

[2] Despite the Plan's argument otherwise, the language cited above is applicable to the case at bar even though there is no conflict of interest present in this case as in Stup.  The language quoted above plainly states that it applies in a case where the abuse of discretion standard applies.

13

physician's opinion any special weight, a plan administrator "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).

First, the Plan plainly states that physical examination findings are objective evidence. The Plan states that Evans must prove that she is disabled based on objective evidence, which includes physical examination findings, diagnostic test results/imaging studies, diagnosis, X-ray results, observation of anatomical, physiological, or psychological abnormalities, and medications and/or treatment plan. (R. 16.) "The plain language of an ERISA plan must be enforced in accordance with its literal and natural meaning." Kress v. Food Employers Labor Relations Ass'n, 391 F.3d 563, 568 (4th Cir. 2004) (internal quotation marks omitted). "The award of benefits under any ERISA plan is governed . . . by the language of the plan itself. If the denial of benefits is contrary to the clear language of the Plan, the decision [of the fiduciary] will constitute an abuse of discretion." Lockhart v. United Mine Workers of Am. 1974 Pension Trust, 5 F.3d 74, 78 (4th Cir. 1993) (internal quotation marks and citations omitted).

Drs. Boyd, Murphy, and Bucci are the only physicians who physically examined Evans, and all of them concluded that she was totally disabled based on their examination of Evans and review of the other objective medical evidence. Evans concedes that she experienced some improvement in her rheumatoid arthritis in 2003 and 2004. (Pl.'s Mem. Supp. J. 4.) This improvement is noted in Drs. Boyd and Murphy's records. (R. 173-75.) However, Dr. Boyd indicated in his letter dated August 12, 2004, that the fact that he noted improvement in Evans' rheumatoid arthritis did not mean that she was or is currently capable

of working.  (Id. 274.)  Further, Dr. Boyd outlined his observations from examining Evans

which supported his opinion as follows:

> From a physical examination perspective she has had heat, redness, swelling and
> tenderness of 2-4 PIP and MCP joints as well as both wrists.  She has had
> tenderness and swelling of her elbows.  Shoulders have been tender.  She has had
> discomfort with range of the hips.  Knees have been swollen with heat, redness,
> erythema, and tenderness. Ankles have been tender.  She has had decreased grip
> and decrease in fine and gross movements of her hands.  She has difficulty in
> raising her arms over her head because of her shoulder pain.  She has difficulty
> standing or walking because of her hip and knee pain.  Similarly, she has
> difficulty sitting for any period of time because of her substantial stiffness that
> occurs with sitting.

(Id.)  Likewise, Dr. Murphy completed a comprehensive medical examination of Evans on

December 30, 2003, in which he concluded that Evans was totally disabled and unable to

work based on his examination. (Id. 204-05.)  Further, in April 2006, Dr. Bucci concluded,

based on his physical examination of Evans and a review of certain medical records, that she

was totally disabled.  (Id. 421-22.)  Dr. Bucci found that

> Ms. Evans has wide spread degenerative arthritis, rheumatoid arthritis, joint
> deformities, and severe spinal stenosis, both radiography and clinically.  She
> exhibits an increased flexion posture to her spine, which is typical of spinal
> stenosis patients.  Extension causes worsening pain.  She is obviously able to
> flex forward but has difficulty with extension.  Her gait demonstrates this as
> well.  At the present time, I do not feel that this lady can perform any type of
> useful occupation given the fact that she is so encumbered with arthritis, both in
> the form of degenerative arthritis and rheumatoid arthritis.  Furthermore, she
> has significant clinical and radiographical spinal stenosis, which would limit her
> ability to function in a work environment as well.

(R. 421-22.)  These doctors' conclusions, based on their physical examinations of Evans, are

substantial objective evidence of disability under the Plan.  See Neumann v. Prudential Ins.

Co. of Am., 367 F. Supp. 2d 969, 990 (E.D. Va. 2005) (finding that examining physicians'

opinions were more credible because "each physically examined and interviewed plaintiff").

15

The Plan concedes that Evans suffers from active rheumatoid arthritis, but alleges that it does not prevent her from sedentary work. (Def.'s Reply Mem. Supp. J. 8.) However, in light of the fact that the other objective evidence in the record indicates that Evans suffers from rheumatoid arthritis and back and leg problems, Eaton abused its discretion in failing to afford greater weight to the physical examination findings of Evans' examining physicians.

In contrast to the examining physicians' opinions, the opinions of the non-examining physicians are not persuasive. In formulating his opinion, Dr. Trangle, along with the other reviewers, relied in part on Dr. Boyd's office notes indicating that after taking Enbrel, Evans had improved. (R. 173-74.) However, Dr. Boyd indicated in his August 12, 2004, letter that the fact that Evans' condition improved did not indicate that she could work. (Id. 274.) Dr. Boyd noted that

> One can have a severe arthritic problem and get some improvement with medications and still be incapable functionally of working in a job. That is the case with Ms. Evans. She has had some response to the medications but not enough to allow us to remove the label of permanent and total disability for her. I do not think her situation will ever change and I think she will be disabled long term.

(Id.) As such, Dr. Boyd's statements that Evans' rheumatoid arthritis had improved are not substantial evidence that Evans can work on a consistent basis.

Further, Dr. Trangle, the Broadspire in-house reviewers, and the MRIoA reviewer relied on the FCE. On the first page of the FCE, the preparer selects the purpose of the FCE from a listing. The purpose of Evans' FCE was to provide a "comprehensive functional evaluation." Notably, the preparer did not select "occupational/work capacity" as the purpose of the FCE. (Id. 213.) The FCE concluded that Evans "is capable of performing any job in

the LIGHT category of work in an 8 hour period" with certain limitations. (Id.) It is unclear

how long the FCE lasted, but, at the most, it was one day. The FCE does not conclude that

Evans is capable of working consistently. Instead, the FCE concluded that she could engage

in light work in "an 8 hour period." (Id.) Therefore, the court finds that the FCE does not

provide substantial evidence that Evans can consistently perform light work. See Stup, 390

F.3d at 309 (noting that an FCE which lasted only two and a half hours does not necessarily

indicate the claimant's "ability to perform sedentary work for an eight (or even four-) hour

workday, five days a week" and further, noting that "[e]ven if the results of the FCE had

shown conclusively that [the claimant] could perform sedentary tasks for the duration of the

test, which they do not, those results provide no evidence as to her abilities for a longer

period").

        Further, the MRIoA reviewer and Broadspire's in-house reviewers relied on Evans'

statements in the resource questionnaire that she could drive, cook, wash dishes, and do

crafts. (R. 133-34, 150-53.) In addition, Eaton cited Evans' statements in the resource

questionnaire in its initial denial letter. (Id. 153-60.) While her statements may indicate

improvement in her condition, Evans' statements do not address her ability to work. In

addition, reliance on this evidence ignores Evans' statement in the questionnaire that she

experienced stiffness and pain all over and that she often had difficulty "making it through the

day." (Id. 155.) Further, Evans stated that she experienced swelling in her ankles and wrists,

trouble "holding objects and standing up." (Id.) In addition, in her appeal, Evans stated that

her

17

joints are still swollen and nothing has . . . changed about my condition. . . . The accident that I was in on October 24, 2002 where a car back into me has made it very hard on my body with arthritis having to take pain medication along with my other medicines. My TV in my bed room and I have the desire to do grapevine wreaths, but I have not done those do [sic] to my pain in my hands and arms and back. Right now all of my medicines have been moved to the CVS just 5 minutes from where we live and my husband gets them or my daughter. I might if I am on my way from the doctor office. I have stockings to wear to help with the puffness [sic] in my legs every day. My hips and back hurt all the time they stay sore even with pain pills and the orthopedic surgeon advise me to not have surgery and one said it was arthritis at the tip of my spine so I am really in a fix! I can't stand up long and something is pulling me forward when standing. When I ask the bone doctor about this problem, he did not know, and when I ask my arthritis doctor he could not give me a answer neither, so who do know? So look like the older I get I am going to walk bent over or get some help in therapy.

(Id. 245-46.); see Donovan v. Eaton Long Term Dis. Plan, 2006 WL 2530393, at *5 (4th Cir. Sept. 5. 2006) (noting that the peer reviewer unreasonably relied on statements in a resource questionnaire that the claimant was "able to cook, do shopping, do laundry, and clean the dishes on a regular basis" as well as "perform all of her activities of daily living, and . . . drive[]," to the exclusion of the claimant's statements that she suffered from chronic neck, back, and leg pain and severe fatigue, and the claimant's limitation of her activities in the resource questionnaire). As such, Evans' statements in the resource questionnaire are not substantial evidence that Evans can work a full-time job.

Moreover, Broadspire's in-house physician reviewers are not as credible as Evans' examining physicians because they all indicated that additional information would be helpful in evaluating Evans' claim. In fact, Drs. Sherrer and Cohan indicated that an independent medical examination would be helpful. (R. 268, 291.) After review of the record, and in light of Dr. Sherrer's indication that an examination of Evans would be helpful, Evans' counsel

18

wrote a letter to the Plan's counsel stating in pertinent part, "a remand would be appropriate

so that [Evans] can undergo . . . an evaluation and submit" it for consideration. (Pl.'s Mem.

Supp. J. Ex. A (Letter of Dec. 20, 2005 from Hoskins to Zimon).)  However, Broadspire's

in-house physicians and the MRIoA reviewer were not provided with Dr. Bucci's report,

although Drs. Cohen and Sherrer specifically felt that this information would be helpful.

      Further, the MRIoA reviewer is not as credible as Evans' examining physicians.  First,

the MRIoA reviewer is anonymous.  Hence, an anonymous reviewer is not accountable for the

findings in their report.  Further, it appears to the court that the MRIoA reviewer did not

independently evaluate Evans' claims.  The reviewer noted that "I will not go into much detail

here as to her medical care and evaluations, suffice it to say that every other physician who

examined the records over the past two years has determined that she does not meet criteria

for permanent disability."  (R. 404.)

      Moreover, the MRIoA reviewer incorrectly indicated that "the patient has been on

disability since [1998] and is attempting to change from part-time to full-time disability for

benefits, which were stopped earlier this year as her case was being assessed." (Id.)  It is

unclear what the MRIoA reviewer was referring to in this statement.  (Id.)  Further, the

reviewer did not evaluate Evans' condition as a whole.  Instead, the reviewer evaluated

Evans' rheumatoid arthritis separately in one opinion dated November 30, 2004, and then

opined as to Evans' lumbar and vertebral conditions in another opinion dated December

20,2004.  (Id. 399-405.)

      In the November 30, 2004, report, the MRIoA reviewer supported his findings with

respect to Evans' rheumatoid arthritis as follows:

The patient has had chronic pain from what is clearly undertreated arthritis for many years.  Indeed, when she first presented her joint problems obviously posed at least a partial disability, but it was never clear on what basis her rheumatoligist claims she is permanently disabled.  Radiologic studies available note only erosions and not significant joint destruction.  The patient is not wheel chair bound, can clearly perform most of her ADLs, and even "passed" a functional capacity exam indicating her ability to perform at least some meaningful work, which was available at the time.  Her response to Enbrel suggests that under treated, active rheumatoid arthritis was clearly an issue, but not one resulting in what could legally and policy-wise be classified as a permanent disability.  The available information clearly and conclusively supports this determination.

(Id. 408.)

The MRIoA reviewer's findings seem to allege that Evans has never been totally disabled.  It is clear from the record that Eaton considered Evans to be disabled for six years.  During those six years, Broadspire periodically reviewed and confirmed Evans' disability.  Further, the reviewer placed great weight on the fact that Evans was not wheelchair bound, could perform most of her ADLs, and "even passed" an FCE.  (R. 408.)  As discussed above, the simple fact that Evans is not in a wheel chair and can perform most of her activities of daily living does not indicate that Evans can perform a full-time job.  The MRIoA reviewer's reports are ambiguous and lacking in veracity.   It was wholly unreasonable for the Plan to consider the MRIoA reviewer's opinions on an equal footing with Evans' examining physicians' opinions.

Likewise, Dr. Trangle's opinion is not persuasive, and Eaton abused its discretion in crediting Dr. Trangle's opinion over the opinions of Evans' examining physicians.  Prior to receipt of Dr. Bucci's report, Dr. Trangle found that Evans

does have and has had a low degree of rheumatoid seropositive arthritis with some intermittent low grade synovitis.  However, she appears to be capable of

20

performing sedentary to light activities based upon all the available information and taking into account all of her other medical problems including spinal stenosis. There appears to be no impediment to her doing a minimal amount of walking and being on her feet at least 15 minutes to 30 minutes out of every hour. There appears to be no impediment also for her handling objects on a regular basis weighing 10 pounds and occasionally up to 20 pounds. There appears to be very little if any limitation in her ability to use a computer keyboard, telephone, handle paperwork or talk to individuals.

The medical records of Dr. Boyd indicate that the degree of synovitis has been of a very low grade or absent on several occasions in the 2004 period which represent that last period of time under consideration of her disability status. Despite the comments by Dr. Cohan on 6/16/04 and Dr. Sherrer on 10/13/04 that an IME examination may be helpful, I believe the medical records are sufficient to indicate that the degree, extent and scope of her problems have been relatively minimal compared to the requirements of a light to sedentary job position. The examinations by Dr. Boyd, the Functional Capacity Assessments, the laboratory studies, the MRI tests and the EMG/NCV electrophysiological tests all would indicate objective evidence sufficient, in my opinion, that although it may have been helpful it was not necessary to secure such an examination to determine that she has been capable of sedentary to light activity.

(Id. 419.) After receipt of Dr. Bucci's report, the Plan provided only Dr. Trangle with a

copy. After reviewing Dr. Bucci's report, Dr. Trangle noted that

[i]t is true that she has seropositive rheumatoid arthritis and has had this for at least the last six years as it was first noted in 2000. She had normal sedimentation rates and C-reactive proteins also around the same time having gone back to the normal range by the year 2003. Despite Dr. Bucci's opinion, review of the records indicates that she had barely detectable elevated rheumatoid factor markers. Sedimentation rates and CRP were normal. Additionally, on multiple x-rays she had only minimal osteoarthritic changes and certainly had no evidence of severe bone erosions, deformity, subluxations or other potential problems one could have with rheumatoid arthritis. Her own doctor indicated that at most she had in 2002 synovitis of both wrists to fourth PIP and MCP joint bilaterally. However, after she began on Enbrel in August of 2003 she had very little joint pain and had no signs of synovitis when she was seen. On her examination 12/30/03 she did complain of some discomfort in one of her joints of the third finger but beyond that she had no evidence of any active synovitis with the question of some perhaps minimal synovitis of the wrists. The rest of the examination was completely normal. Most of this comes from her own doctor's notes.

21

(Id. 475-76.)  Further, Dr. Trangle stated that

> the EMG/NCV study, the physical examination and the x-rays although did show
> some spinal stenosis and some radiculopathy it was mild in nature and was not
> "severe stenosis" that Dr. Bucci was opining she had.  It is possible now, over
> two years later, that she does have increased spinal stenosis and it is possible that
> examination does show antalgic spinal stenotic gait.  It is also possible now two
> years later, that she may have had a resurgence of her arthritis and it is even
> possible, although unlikely, that she had developed severe rheumatoid arthritic
> changes of her joints.  Once again, this is two years after the relevant date.

(Id. 476.)  First, Dr. Trangle incorrectly noted that Evans had normal c-reactive protein

levels.  In 2004, Evans' c-reactive protein levels and RA latex turbid levels were elevated.

(Id. 247-48.)  In addition, unlike Dr. Trangle, Drs. Boyd, Murphy, and Bucci had an

opportunity to examine Evans.  Dr. Trangle disagreed with Dr. Bucci's opinion that Evans'

stenosis was severe.   However, the x-ray report noted that Evans had "a severe decrease in

the height of the L4-5 disc space" and "marked loss of the normal sagittal spinal contour."

(R. 188.)  Therefore, Dr. Bucci's finding that Evans had severe stenosis is consistent with the

October 2004 x-ray and is further bolstered by his findings from his examination of Evans.  In

addition, Dr. Trangle conceded that Evans' spinal stenosis may have worsened over time.

Based on the foregoing and for the reasons discussed above, the court finds that Eaton

abused its discretion in failing to find Evans' examining physicians' opinions more credible

than the opinions of Dr. Trangle, Broadspire's in-house physicians, and the MRIoA reviewer.

In the final denial letter, the Plan discounted Dr. Bucci's opinion on the basis that it

"appeared to be based on his evaluation of Ms. Evans' current medical condition" and that

further, "Dr. Bucci did not review the entire administrative record . . . and thus would not be

able to render an opinion regarding Ms. Evans' condition at the relevant time."  (R. 477.)   In

addition, the Plan relies on this argument in its memorandum in support of judgment. (Def.'s Mem. Supp. J. 18-20, 33.)

The Plan cannot in good faith argue that Dr. Bucci's April 2006 physical examination of Evans can be dismissed because it is two years after the relevant date. Broadspire's own in-house physicians, Drs. Sherrer and Cohan, believed that an independent medical examination would be helpful in evaluating Evans' condition. After Evans' counsel reviewed the record and learned that Drs. Sherrer and Cohan felt that a medical examination would be helpful, he wrote the Plan's counsel and indicated that a remand was appropriate to allow a medical examination of Evans. (Pl.'s Mem. Supp. J. Ex. A (Letter from Hoskins to Zimon of Dec. 20, 2005).) Thereafter, the parties consented to stay this action pending a medical examination. However, prior to the execution of the order staying this case, the Plan asked Dr. Trangle to review Evans' file. Dr. Trangle conveniently found that while an independent medical examination would be helpful, it was not necessary.

Eaton never informed Evans that an independent medical examination would be helpful and certainly never requested such an examination. According to Evans' counsel, she would have gladly consented to another examination. As such, the Plan cannot in good faith discount Dr. Bucci's opinion based on the timing of his examination, because the Plan consented to a stay in this case to allow for a medical examination.

In addition, although Dr. Bucci did not have the entire record when formulating his opinion, he was provided with the opinions of the Broadspire in-house physicians and with Drs. Murphy and Boyd's medical records, which summarized the medical records, including the November 10, 2003, and July 5, 2003, MRIs; the November 14, 2003, EMG; and the

October 2004, x-ray report. (R. 428-61.) More importantly, Dr. Bucci had the opportunity to examine Evans. As such, this basis alone is insufficient to discount Dr. Bucci's opinion in light of his examination of Evans and Drs. Murphy and Boyd's consistent opinions.

As discussed above, Eaton's decision to deny Evans LTD benefits is unreasonable and not supported by substantial evidence in the record. Based on the foregoing, the court finds that Eaton abused its discretion in denying Evans LTD benefits. As such, Eaton's denial of LTD benefits is reversed.

It is therefore

**ORDERED** that Eaton's decision denying Evans LTD benefits is reversed. It is further

**ORDERED** that the Plan pay LTD benefits to Evans.

**IT IS SO ORDERED**.


s/Henry M. Herlong, Jr.
United States District Judge

Greenville, South Carolina
October 18, 2006

24